**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MONICA JONES,** | ) | |
| | ) | **No. 11 CV 3958** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | **September 18, 2012** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION and ORDER**

Monica Jones has struggled with asthma since she was a child, and she claims that in 2006, the symptoms of her life-long affliction became disabling. In 2007 she sought disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"), 42 U.S.C. §§ 416(I), 423, 1382c, but the Commissioner denied her applications. Currently before the court is Jones's motion for summary judgment challenging this denial. For the following reasons, the motion is denied:

**Procedural History**

Jones filed her applications for DIB and SSI in December 2007. (A.R. 88-103.) In her SSI application Jones stated that she has been disabled since birth, (id. at 88), but in her DIB application she cited the onset date of her disability as December 1, 2006, (id. at 96). The Commissioner denied her claims initially and on reconsideration. (Id. at 61-64.) Jones then requested, and was granted, a hearing before an administrative law judge ("ALJ"). After considering Jones's testimony and medical evidence, the ALJ concluded that she is not

disabled as defined in the Social Security Act. (Id. at 29.) When the Appeals Council denied her request for review, (id. at 1-4), the ALJ's decision became the final decision of the Commissioner, *see Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). On June 9, 2011, Jones filed the current suit seeking judicial review of the ALJ's decision. See 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

Jones was first diagnosed with asthma as a child and has suffered from asthma attacks throughout her life. In addition to her asthma symptoms Jones has experienced depression and a condition called gastroesophageal reflux disease ("GERD"), with related symptoms including chest tightness, abdominal pain, and bowel and urinary urgency. At her March 2010 hearing before an ALJ, Jones submitted both documentary and testimonial evidence in support of her disability claim.

## A.     Jones's Medical Evidence

In March 2007 Jones was hospitalized for one night after she experienced coughing and shortness of breath related to her asthma. (A.R. 208.) Jones's treating physician, Dr. Cynthia Ham, noted that she had run out of her medications and had been without them for several months. (Id. at 208, 210.) The admitting physician noted that Jones had been smoking about a quarter of a pack of cigarettes a day for the past 10 or more years. (Id. at 212, 214.) She was diagnosed with "[a]sthma exacerbation secondary to running out of her maintenance medication." (Id. at 215.) After Jones was given Albuteral and Atrovent

nebulizer treatments every six hours, Dr. Ham noted that her "respiratory status improved tremendously overnight." (Id. at 208.) She was discharged with a social services consultation to help her with her prescribed medications, which included Advair and Albuterol inhalers and Prednisone. (Id. at 209.)

In January 2008 consulting physician Dr. Richard Bilinsky reviewed Jones's file and completed a physical residual functional capacity ("RFC") assessment at the behest of the Commissioner. (Id. at 228-235.) Dr. Bilinsky opined that Jones's impairments do not result in any exertional limitations, but that she requires a work environment that would allow her to avoid concentrated exposure to fumes, odors, dusts, gasses, or poor ventilation. (Id. at 229, 232.) Dr. Bilinsky commented that Jones's only asthma exacerbation was the March 2007 attack that resulted in her hospitalization and noted that "it appears the claimant's asthma has been controlled with medication." (Id. at 235.)

In the spring of 2008 the Bureau of Disability Determination Services asked Jones to undergo objective mental status and physical evaluations with consulting doctors. Clinical psychologist Michael Stempniak conducted the mental status examination. (Id. at 254.) Jones reported to Stempniak that she had "struggled with depression all of her life" and that it was "always there in the background." (Id. at 255.) After conducting his evaluation, Stempniak determined that Jones met the criteria for Major Depressive Disorder, but characterized her condition as "mild." (Id. at 257.) He noted that she "can concentrate with effort" and "seems capable of managing her own funds." (Id.) Dr. Roopa Karri conducted the physical examination. (Id. at 258-261.) Jones told Dr. Karri that she uses Prednisone and

3

Proventil to treat her asthma, but she denied using a nebulizer. (Id. at 259.) Dr. Karri described her impression of Jones as including a "[h]istory of asthma since birth with prolonged expiration on exam" and depression. (Id. at 261.) Her report makes no mention of any stomach or digestive issues. (Id.)

In August 2008 Jones went to see an allergist, Dr. Michael Cavanaugh, to undergo a slate of allergy tests. (Id. at 289.) The tests revealed that Jones is reactive to a number of environmental allergens, including grass, dust mites, and mold. (Id.) Dr. Cavanaugh also administered a forced vital capacity test. Before taking medication, the result showed that Jones had mild obstruction, but after medication her capacity level was normal. (Id. at 292.) Dr. Cavanaugh physically examined Jones and filled out a report but his writing is almost completely illegible. (Id. at 293-96.) Jones's attorney asked Dr. Cavanaugh to complete a Pulmonary Residual Functional Capacity Questionnaire. (Id. at 299-302.) Again his writing on the form is by and large illegible, but from what can be deciphered, he diagnosed Jones as having asthma, allergies, and GERD, with symptoms including shortness of breath, chest tightness, wheezing, rhonci, edema, and coughing. (Id. at 299.) He wrote that she has chronic daily wheezing and wakes up every night with symptoms and that her attacks occur "daily." (Id. at 299-300.) When asked to estimate Jones's functional limitations resulting from her impairments, Dr. Cavanaugh wrote "I don't know" next to the question and declined to mark any of the boxes where he was asked to give an opinion about her exertional and nonexertional limitations. (Id. at 301-02.) He did opine, however, that her symptoms

4

would "constantly" interfere with her ability to concentrate enough to perform even simple work tasks. (Id. at 300.)

In July 2009, Jones went to Dr. Fehmida Khan after she experienced symptoms of abdominal distress and indigestion. (Id. at 313.) To rule out the possibility of GERD, Dr. Khan scheduled Jones for an outpatient esophagogastroduodenoscopy—a mouthful of a title for a procedure that allows a doctor to view the upper portion of a patient's gastrointestinal tract. (Id. 311, 314.) The test revealed esophagitis and erosive gastritis in the stomach. (Id. at 311.) Dr. Khan recommended that Jones raise the head of her bed by four to six inches, wear garments that fit loosely around the abdomen, and avoid smoking, caffeine, and eating before bed. (Id. at 312.) A month after the procedure, Dr. Khan filled out a "Gastritis/Irritable Bowel Syndrome Medical Assessment Form" for Jones. (Id. at 331.) She listed Jones's diagnoses as GERD, abdominal gas or bloating, and asthma, but described her prognosis as being "good." (Id.) Dr. Kahn declined to complete the parts of the form that ask about the patient's limitations with attention and concentration or reactions to stress. (Id. at 331-32.) In the margins of the form Dr. Kahn wrote that "GERD & Gastritis do not cause impairment to work" and "do not cause patient to be absent from work." (Id. at 332-33.)

On March 15, 2010, five days after Jones's hearing before the ALJ, Dr. Cavanaugh submitted a supplemental asthma report (typed, this time) on Jones's behalf. (Id. at 345.) Dr. Cavanaugh wrote that her standard vital capacity tests "have varied from normal to mild," but the most recent test showed moderate obstruction. (Id.) He noted his

"understanding that Ms. Jones would not meet a listing impairment under Section 3 based on the testing results." (Id.) He reported that Jones uses her nebulizer "regularly" and gets asthma attacks seven to eight times a month. (Id.) Although Dr. Cavanaugh is an allergist—not a gastroenterologist—he wrote without further explanation that Jones "has disabling symptoms from GERD which can cause chest tightness." (Id.) He reported that her GERD condition requires twice-daily medication, but that the state will pay for only a once-daily dosage. (Id.) He did not note that Jones has any functional impairments, but advised that she should avoid exposure to cigarettes, perfumes, cleaning solvents, extreme temperatures, and dust, among other things. (Id.)

## B.     Jones's Testimony

At her hearing before the ALJ, Jones described the nature and severity of her symptoms and explained their impact on her daily life. Jones explained that she lives in an apartment with her teenaged daughter. (A.R. 40-41.) She testified that she had previously worked as a telecommunications operator, but that the job only lasted a month and a half because she missed a lot of days and had a hard time keeping up with the calls. (Id. at 42-43.) Jones testified that she lived in Georgia in 2007 while pursuing a college degree, but she had to quit because of her illness and because of financial problems. (Id. at 43.) She said that the only job she has had for more than six months was when she took care of children in her home. (Id. at 44.)

When asked about her habits and daily activities, Jones testified that she quit smoking in January 2008. (Id. at 45.) She said that she has trouble falling asleep because her

medications make her "really jittery" and "nervous." (Id. at 48.) She explained that she spends most of her day reading the Bible and praying. (Id. at 49.) Jones said that she goes to church every Sunday but does not participate in any of the extra church activities or socialize with friends. (Id. at 55.)

The ALJ asked Jones to describe the kind of medical treatment she has pursued for her asthma. Jones said that she no longer goes to the emergency room when she has an asthma attack because she has a nebulizer at home. (Id. at 46.) According to Jones, the nebulizer is the same treatment a doctor would perform in the emergency room. (Id.) Jones said that she has to use the nebulizer a couple of times a week, usually when the weather is bad. (Id.) During a particularly bad attack, Jones said that she will use the nebulizer every four hours or so and that she "couldn't do anything for the remainder of the day." (Id. at 47.) At the time of the hearing, she had not used the nebulizer since the previous week. (Id. at 46.) Jones explained that she also uses medications including Singulair, Advair, Nasacourt, Flonaze, and Albuterol to treat her asthma, and said that the medicines "controls it," and "helps sometimes." (Id. at 47.) Still, Jones testified that she gets severe attacks requiring nebulizer treatments seven to eight times per month, on average. (Id.)

Jones also fielded questions posed by her attorney, who asked her to describe in further detail the side effects caused by her medicine. She said that she has dizziness, headaches, tremors, and nervousness. (Id. at 56.) She also described the symptoms related to her GERD problem. She said that she uses the bathroom "more frequently than the average person," and that the need to go immediately can hit her without warning. (Id. at

7

57.)  Jones testified that when she is having those symptoms or experiencing an asthma

attack she is unable to concentrate on what she is doing.  (Id. at 57-58.)

**C.     The ALJ's Decision**

After considering the proffered evidence, the ALJ concluded that Jones is not

disabled.  In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R.

§ 404.1520, which requires her to analyze:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant
> has a severe impairment; (3) whether the claimant's impairment meets or
> equals one of the impairments listed by the [Commissioner], *see* 20
> C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past
> work; and (5) whether the claimant is capable of performing work in the
> national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309,

313 (7th Cir. 1995)).  If at step three of this framework the ALJ finds that the claimant has

a severe impairment which does not meet the listings, she must "assess and make a finding

about [the claimant's RFC] based on all the relevant medical and other evidence."  20 C.F.R.

§ 404.1520(e).  The ALJ then uses the RFC to determine at steps four and five whether the

claimant can return to her past work or to different available work.  *Id.* § 404.1520(f), (g).

It is the claimant's burden to prove that she has a severe impairment that prevents her from

performing past relevant work.  42 U.S.C. § 423(d)(2)(A); *Clifford*, 227 F.3d at 868.

Here, the ALJ determined at steps one and two of the analysis that Jones has been

unemployed since December 1, 2006, and that her asthma constitutes a severe impairment.

(A.R. 25-26.)  At step three the ALJ determined that Jones's impairment or combination of

8

impairments neither meets nor medically equals any of the listings. (Id. at 27.) The ALJ explained that the "record does not reflect any pulmonary function studies with results equivalent to that required under the tables associated with section 3.02 and her asthma does not meet the requirements found in listing 3.03." (Id.)

Proceeding to the next step of the analysis, the ALJ determined that Jones has the RFC to perform light work with an environmental limitation preventing her from "working around high levels of dusts and fumes." (Id. at 27.) In explaining her conclusion, the ALJ noted that she "cannot find significant medical findings that would allow additional limitations to be added to the ascribed RFC." (Id. at 28.) She noted that Jones has had asthma since childhood and has only one reported exacerbation that happened in 2007, when she was still smoking. (Id.) She noted that Jones continued to smoke into December 2007 and stated that "[o]bviously, smoking would aggravate her alleged breathing difficulties." (Id.) The ALJ noted that Dr. Cavanaugh's report from September 2009 described her as "better overall," a description which left the ALJ with "the impression that claimant's conditions are fairly stable and well controlled." (Id.) Other factors in the ALJ's conclusion included Jones's description of her daily activities, which the ALJ considered to be less limited than one would expect from someone with disabling symptoms; the ALJ' assessment that her asthma treatment "has been essentially routine and/or conservative in nature;" and her observation that Jones's appearance and demeanor were "generally unpersuasive" during the hearing. (Id.)

Having assessed that Jones retains an RFC for light work, the ALJ determined that she is capable of returning to her past relevant work in childcare. (Id. at 28.) Accordingly, the ALJ concluded that Jones is not under a disability as defined by the Social Security Act, and denied her applications for SSI and DIB. (Id. at 29.)

## Analysis

In her motion for summary judgment Jones argues that the ALJ's decision should be reversed for several reasons. First she argues that the ALJ's finding that Jones's asthma does not meet Listing 3.03 is unsupported. Next she argues that the ALJ insufficiently engaged with the objective medical evidence in crafting the RFC and erroneously failed to consider the combined effects of her asthma, GERD symptoms, and depression. Finally, Jones argues that the ALJ's credibility determination is marred by reversible error because, according to her, the ALJ overlooked pertinent aspects of her descriptions of her daily activities and failed to consider how Dr. Cavanaugh's reports support her testimony.

In reviewing an ALJ's decision to deny disability benefits a district court will ask only whether that decision is free of legal error and supported by substantial evidence. *Farrell v. Astrue*, __ F.3d __, 2012 WL 3686383, at *3 (7th Cir. Aug. 28, 2012). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal quotation omitted). The ALJ is not required to analyze every piece of record evidence, and her decision will be affirmed so long as she provides "an accurate and logical bridge" between the evidence and her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This

court will not substitute its own judgment for that of the ALJ, and as long as substantial evidence supports the decision, the court will affirm even "if reasonable minds can differ over whether the applicant is disabled." *See Shideler*, 688 F.3d at 310. On the other hand, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (internal quotation omitted).

## A.    The ALJ's Step-Three Analysis

Jones first argues that the ALJ failed to properly consider whether her asthma meets Listing 3.03. As Jones points out, the ALJ's explanation at step three is terse, consisting only of the following sentence: "The record does not reflect any pulmonary function studies with results equivalent to that required under the tables associated with section 3.02 and her asthma does not meet the requirements found in listing 3.03." (A.R. 27.) According to Jones, this court should remand the case so that the ALJ can explain why her asthma does not meet the listings.

Although this court agrees that the ALJ could have done more to explain her step-three determination, the record makes clear that Jones failed to meet her burden of establishing that she meets all of the requirements of the listing for asthma. *See Filus v. Astrue*, __F.3d__, 2012 WL 3990651, at *4 (7th Cir. Sept. 7, 2012). Unless a claimant fulfills that burden, the "ALJ need not specifically articulate why a claimant falls short of a particular listing." *Alesia v. Astrue*, 789 F.Supp.2d 921, 932 (N.D. Ill. 2011) (citing *Scheck*

*v. Barnhart*, 357 F.3d 697, 700-01 (7th Cir. 2004)).  Jones is claiming to be disabled by

asthma attacks, which are described in Listing 3.03B as follows:

> Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring
> physician intervention, occurring at least once every 2 months or at least six
> times a year.  Each in-patient hospitalization for longer than 24 hours for
> control of asthma counts as two attacks, and an evaluation period of at least 12
> consecutive months must be used to determine the frequency of attacks.

20 C.F.R. 404, Subpt. P, App. 1 § 3.03B.  The listing defining "attacks" requires "prolonged

symptomatic episodes lasting one or more days and requiring intensive treatment, such as

intravenous bronchodilator or antibiotic administration or prolonged inhalational

bronchodilator therapy in a hospital, emergency room or equivalent setting."  Id. § 3.00C.

The medical records Jones submitted in support of her claim do not establish that she

has suffered attacks requiring physician intervention with the frequency and severity required

by Listing 3.03B.  Although Jones was hospitalized in March 2007 during an asthma episode,

that hospitalization occurred not "in spite of prescribed treatment," *see* 20 C.F.R. 404, Subpt.

P, App. 1 § 3.03B, but because she had run out of her medication, (A.R. 208, 210, 215).  *See*

*also Mawalin v. Astrue*, No. 11 CV 1627, 2012 WL 874549, at *10 (N.D. Ill. March 14,

2012) (noting that where claimant visited ER because he ran out of medication, "it cannot

be said that either of these attacks required medical intervention in spite of Plaintiff's use of

prescribed treatment").  Even if her March 2007 hospitalization could be characterized as an

episode requiring physician intervention "in spite of prescribed treatment," the record

documents that in the period that followed she only sought physician intervention for her

12

asthma in January, March, April, and June of 2008. That falls short of the six required episodes in a year, looking at a consecutive period of twelve months. *See* 20 C.F.R. 404, Subpt. P, App. 1 § 3.03(b). And the notes from the 2008 doctor visits reveal that Jones was seeking treatment for her on-going condition, not emergency intervention to ward off an acute asthma attack as described in the relevant listing. Even her treating physician, Dr. Cavanaugh, conceded that Jones "would not meet a listing impairment under Section 3 based on the testing results." (A.R. 345.) Thus the longitudinal, objective medical evidence amply supports the ALJ's conclusion that Jones's asthma—though severe—does not rise to the listings level.

Jones argues that she is entitled to a more detailed evaluation at step three because she testified at the hearing that she experiences asthma attacks seven or eight times a month, (Id. at 46-47), and Dr. Cavanaugh submitted a report repeating that claim, (id. at 345). But even crediting her testimony regarding the frequency of her asthma attacks, there is no evidence in the record establishing that the attacks she describes rise to the level of severity described in Listing 3.00C. The listing only counts as an "attack" an episode that lasts for more than a day and requires intensive treatment in a "hospital, emergency room or equivalent setting." 20 C.F.R. 404, Suppt. P, App. 1 § 3.00C. Jones testified that when she has an attack, she will "use the [nebulizer] machine at home like, every four hours or so as needed if it's really bad or something, you know, so it was pretty bad, you know, so I couldn't do anything for the remainder of the day." (A.R. 47.) But she did not testify that the attacks themselves last for more than a day, or clarify how many of her average of seven to eight attacks per month she

considers severe. (Id. at 47-48.) Jones now argues that treating her asthma with a nebulizer in her home constitutes intensive treatment in a setting "equivalent" to a hospital, because according to her, had she reported to an emergency room the doctors would have treated her with a nebulizer anyway. But her argument rests on nothing but her experience of how her doctors prescribed treatment during visits to a primary care service at a community health center. (*See, e.g.*, id. at 273.) Aside from the 2007 hospitalization, Jones points to no evidence that she sought emergency-room attention for her asthma that might lend credence to her speculation as to how emergency-room physicians would treat an acute attack. Pointing to her decision not to seek physician intervention for her attacks all but proves the point that they did not rise to the level of severity described in Listing 3.00C. Because Jones did not meet her burden of submitting evidence that she meets all of the requirements of Listing 3.03, there is no need for this court to remand this case for a more detailed step-three analysis. *See Scheck*, 357 F.3d at 700-01.

**B.     The ALJ's RFC Assessment**

Next Jones argues that the ALJ failed to fully consider the medical evidence, to evaluate the cumulative impact of her impairments, or to properly assess her credibility in determining that she retains an RFC for light work, with a limitation preventing her from working "around high levels of dust and fumes." (*See* A.R. 27.) In crafting the RFC, the ALJ noted that she "cannot find significant medical findings that would allow additional limitations." (Id. at 28.) She noted that Jones's asthma is on-going since childhood, but explained that other than the March 2007 hospitalization, "there have not been any recorded

14

exacerbations of asthma, which demonstrat[es] that claimant's asthma is well controlled."
(Id.)  The ALJ acknowledged Jones's complaints of depression and discussed the treatment
of her GERD symptoms, but concluded that the medical evidence supported her ability to
perform light work.  (Id. at 27-28.)

In challenging the RFC assessment Jones first argues that the ALJ impermissibly
"played doctor" in reviewing the medical record.  Specifically, she criticizes the ALJ for
commenting that her "treatment has been essentially routine and/or conservative in nature."
(Id. at 28.)  Jones correctly points out that ALJs "must not succumb to the temptation to play
doctor and make their own independent medical findings."  *See Rohan v. Chater*, 98 F.3d
966, 970 (7th Cir. 1996).  But the regulations allow an ALJ to consider the nature of a
claimant's treatment history, and this court is required to give deference to the ALJ's factual
determination stemming from that history.  *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir.
2009).  Given the ALJ's correct observation that Jones had only experienced one asthma
exacerbation, and the lack of evidence that Jones sought treatment beyond medicines she was
able to self-administer, the ALJ's characterization of her treatment as "conservative" does
not overstep the bounds of her role.  *See id.* (stating that court "will not question" ALJ's
finding that claimant's treatment was "relatively conservative").

Jones also faults the ALJ for observing that in December 2007—months after her
hospitalization—Jones was smoking four cigarettes a day and that "smoking would aggravate
her alleged breathing difficulties."  (A.R. 28.) Jones argues that she quit smoking in January
2008 and that there is no evidence that her previous tobacco use has any impact on her

15

current symptoms.  But the ALJ did not say that her smoking is causing her symptoms today; she merely noted that her history of smoking likely aggravated the breathing difficulties she had reported in 2007.  One does not have to assume a doctor's role to observe that smoking is a terrible idea when one suffers from severe asthma, and the ALJ's observation here did not cross that line or otherwise undermine her reasoning.

Next Jones argues that the ALJ misinterpreted or overlooked key aspects of Dr. Cavanaugh's reports in concluding that she is capable of performing light work.  The ALJ observed that in September 2009 Dr. Cavanaugh noted that Jones "was better overall," which gave the ALJ the impression that her "conditions are fairly stable and well controlled." (A.R. 28.)  Jones argues that just because her condition in 2009 was "better" does not mean that it was stable or under control, and faults the ALJ for not mentioning that Dr. Cavanaugh reported that she suffers from attacks seven to eight times per month.  But as long as an ALJ does not "cherry-pick" evidence that supports her conclusion, an ALJ is not required to mention every fact in the record that might support a claimant's complaints, *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), and even Dr. Cavanaugh declined to ascribe to Jones limitations beyond those the ALJ incorporated into the RFC.  When asked by Jones's attorney to provide an opinion as to how her asthma limits her abilities to function, Dr. Cavanaugh declined to answer the provided questions and instead responded "I don't know."[1]  (A.R. 301-02.)  That was his response to questions about whether her impairment

---

[1] Jones blames the ALJ for not asking Dr. Cavanaugh to go back and fill in the incomplete sections of the RFC form, but it is her burden—not the ALJ's—to establish that her

is disabling *before* he reported in 2009 that her condition had improved. It is true that Dr. Cavanaugh checked a box on the form indicating that her symptoms would "constantly" interfere with her ability to perform simple work tasks, (id. at 300), but that answer conflicts even with Jones's testimony. Jones said that she is unable to concentrate during attacks, but otherwise she spends much of her day reading. (Id. at 49, 57.) Her testimony is consistent with Dr. Stempniak's observation that Jones "can concentrate with effort." (Id. at 257.) And it appears that Dr. Cavanaugh's statements regarding the frequency of Jones's asthma attacks are based largely on Jones's self-reports. Jones simply has not pointed to any evidence that undermines the ALJ's reading of Dr. Cavanaugh's notes and observations.

Jones also argues that the ALJ committed reversible error in failing to consider the combined effect of her depression, GERD symptoms, and asthma. Jones correctly points out that in assessing a claimant's RFC, an ALJ is charged with considering "the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment." *Denton*, 596 F.3d at 423; 20 C.F.R. § 404.1523. But the burden remains with the claimant to put forth medical evidence demonstrating how her non-severe impairments impact or exacerbate her disabling condition. *See Denton*, 596 F.3d at 424. Jones has not met that burden here. There is no evidence that Jones's depression exacerbates her asthma. The only physician who evaluated her depression described it as being "mild,"

---

impairments are disabling. *See Allord v. Astrue*, 631 F.3d 411, 416 (7th Cir. 2011); 20 C.F.R. § 404.1514. And it is unclear what the ALJ might have gained by forcing Dr. Cavanaugh to answer questions after he made it clear that he did not have their answers. (*See* A.R. 301-02.)

17

and said nothing about whether it contributes to or exacerbates her asthma attacks. (A.R. 257.) As for her GERD symptoms, Jones testified that she has to use the bathroom more frequently and with more urgency "than the average person," (id. at 57), but she said nothing about it contributing to her asthma attacks. Dr. Kahn, the physician who evaluated Jones's stomach problems, specifically noted that her GERD and gastritis "do not cause impairment to work." (Id. at 332.) Dr. Kahn acknowledged that Jones also suffers from asthma, but said nothing to suggest that her stomach issues contribute to that condition. (Id. at 313-14, 331-33.) Dr. Cavanaugh reported in March 2010 that Jones "has disabling symptoms from GERD which can cause chest tightness," but did not explain what he means by "disabling symptoms" or how he, as an allergist, evaluated her GERD symptoms. (Id. at 345.) Even Dr. Cavanaugh admitted being "puzzled by the severity and the disabling symptoms compared to the test findings." (Id.) Because Jones has not pointed to any evidence suggesting that the collective impact of her asthma, GERD, and depression is inconsistent with an RFC for light work, it is unnecessary to remand the case to have the ALJ explicitly evaluate their cumulative effect. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time."); *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) (finding ALJ's failure to explicitly consider impact of obesity on other impairments harmless where claimant failed to specify how

obesity impaired work ability and ALJ implicitly considered condition in citing doctor's reports).

Turning to the ALJ's credibility assessment, Jones challenges the ALJ's statement that among the reasons she was discounting her description of her impairments was because of her "generally unpersuasive appearance and demeanor while testifying at the hearing." (A.R. 28.) Jones argues that this comment is improper because she never testified that she constantly suffered from attacks and because Dr. Cavanaugh's post-hearing report supports her assertion that she suffers from attacks on a daily basis. An ALJ's credibility assessment is entitled to deference unless it is "patently wrong." *See Filus*, 2012 WL 3990651, at *5. "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). Credibility assessments based on the ALJ's assessment of a witness's demeanor are entitled to particular deference, because they "involve intangible and unarticulable elements which impress the ALJ, that, unfortunately leave no trace that can be discerned" in a transcript. *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999) (internal quotation omitted). The ALJ's comment describing Jones's demeanor represents the kind of first-hand observation that reviewing courts are loathe to second-guess. *See id.* Jones has given this court no reason to second-guess the ALJ's observation, especially where it represents but one factor among several the ALJ factored into the credibility analysis.

Jones also challenges the ALJ's comment that her described daily activities "are not limited to the extent one would expect, given the complaints of disabling symptoms and

limitations," (A.R. 28), arguing that the ALJ overlooked her specific descriptions of how she gets through the tasks of daily life. Specifically, Jones faults the ALJ for failing to discuss her testimony that she gets help from her daughter with tasks and that her condition makes it difficult for her to do things like reading and cooking elaborate meals. But Jones testified that she spends a significant part of her day reading the Bible, and although she does not socialize much, she attends church on a weekly basis. (Id. at 49, 55.) Jones did not say that she is dependent on her daughter's help to get by with required tasks of daily living. Once again, Jones has not pointed to any testimony that would cast doubt on the ALJ's characterization of her descriptions of her daily life.

Jones also faults the ALJ for failing to consider the impact of her need to use a nebulizer regularly and how the side effects associated with her asthma medications would impact her ability to work. Jones testified that she needs to use the nebulizer about twice a week when the weather is bad. She testified that she might use the nebulizer every four hours during a particularly bad attack. She said that the side effects of her medications include dizziness, headaches, tremors, and nervousness and that she is not able to concentrate when she is experiencing an attack. (A.R. 56-58.) To the extent that the ALJ failed to factor in the limiting impact of Jones's nebulizer use, that is likely because she explained that she did not find Jones's description of the severity of her symptoms credible. She gave several supported reasons for that finding, including the mismatch between the objective evidence and Jones's complaint, Jones's past decision to smoke despite her symptoms, reports that by 2009 her condition had improved, the nature of the prescribed treatments, and her demeanor

during the hearing. As for the medication side effects, Jones did not say that they interfere with her ability to work, nor does she point to any doctor's reports stating that the side-effects are functionally limiting. Although reasonable minds might disagree over whether the nebulizer use or her medication side-effects have a limiting impact on her ability to work, it is not this court's role to reweigh the evidence Jones presented below. *See Shideler*, 688 F.3d at 310. And absent some evidence that the nebulizer and side-effects functionally impair Jones, this court cannot fault the ALJ for failing to discuss those aspects of her testimony. Because none of the arguments Jones has lodged against the ALJ's credibility analysis show that it is unsupported by the evidence or "patently wrong," and because the RFC finding is otherwise sufficiently articulated and supported by substantial evidence, the ALJ's decision is affirmed.

## Conclusion

It must be noted that the administrative record paints a portrait of Jones as someone who has been dealt a difficult hand in life and who has struggled mightily to earn a living to support herself and her daughter. The court recognizes that Jones has never been accused of being a malingerer, that her symptoms are significant, and that her employment difficulties are real. Nonetheless, this court's role is limited to determining whether the ALJ's reasons for denying her claims are supported by substantial evidence, and here the court must conclude that they are. Accordingly, Jones's motion for summary judgment is denied and the decision of the Commissioner is affirmed.

**ENTER:**

_____

**Young B. Kim**
**United States Magistrate Judge**